IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CAROLYN SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:10-CV-1007-WKW |
| | )           [WO] |
| CITY OF MONTGOMERY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

| | |
|---|---|
| ANTONIO HAIGLER, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:10-CV-1008-WKW |
| | )           [WO] |
| | ) |
| CITY OF MONTGOMERY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Antonio Haigler ("Mr. Haigler") claims that Corporals Eric L. Morris ("Cpl. Morris") and Michael E. Mashburn ("Cpl. Mashburn") of the Montgomery Police Department used excessive force in arresting him, unlawfully arrested him, falsely imprisoned him and filed a false report against him in violation of the Fourth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983 ("§

1983").  Plaintiff Carolyn Smith ("Mrs. Smith")[1] also asserts a Fourth Amendment claim of excessive force against Cpls. Morris and Mashburn.  Plaintiffs assert § 1983 supervisory liability claims against Defendants Mayor Todd Strange ("Mayor Strange"), Police Chief Kevin Murphy ("Chief Murphy") and the City of Montgomery ("the City").[2]  In addition to the above mentioned claims, Plaintiffs also assert claims against all Defendants under 42 U.S.C. § 1985(2) and 42 U.S.C. § 1985(3) for conspiracy to interfere with civil rights and under Alabama law for fraud.[3]

Before the court is Defendants' motion for summary judgment (Doc. # 40), which is accompanied by a supporting brief and evidentiary submissions (Doc. # 41).  Plaintiffs filed a response in opposition.  (Doc. # 43.)  After careful consideration of the arguments of counsel, the applicable law and the record as a whole, the court finds that the motion is due to be granted in part and denied in part.

---

[1]  Mr. Haigler and Mrs. Smith will be referred to collectively as "Plaintiffs."

[2]  Cpls. Morris and Mashburn, Mayor Strange, Chief Murphy, and the City will be referred to collectively as "Defendants."

[3]  Plaintiffs' claims will be referred to as stated in Plaintiffs' Amended Complaint (Doc. # 30): Excessive Force (Count A), Unlawful Arrest (Count B), Filing a False Report or Complaint (Count C), Failure to Supervise Police Officers (Count D), Conspiracy to Interfere with Civil Rights (Counts E & F), False Imprisonment/Wrongful Incarceration (Count G), and State Law Fraud (Count H).  Mr. Haigler is involved in all claims; Mrs. Smith is involved only in the claims of Excessive Force and Failure to Supervise Police Officers.

2

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

On summary judgment, the evidence and the inferences from that evidence must be viewed in the light most favorable to the nonmovant.  *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  Hence, "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008); Fed. R. Civ. P. 56(c). When the nonmovant fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

4

## IV.  BACKGROUND[4]

In the evening of August 7, 2010, Mr. Haigler and his friends came by the apartment of Mrs. Smith, who is Mr. Haigler's mother.  Mr. Haigler had stopped by to check on Mrs. Smith, who was having knee problems for which prescription pain relief was prescribed.  (C. Smith Dep. 19 (Doc. # 40, Ex. 4).)  Mr. Haigler and several of his friends, including Mrs. Smith's husband Isaiah ("Mr. Smith"), were sitting in chairs outside of apartment.  Mrs. Smith was in her living room, speaking to her mother on the phone.  (Haigler Dep. 43 (Doc. # 40, Ex. 3); C. Smith Dep. 18.)  During this time, the Montgomery Police Department Crime Reduction Taskforce (also known as "Jump Street") was patrolling the area in a black unmarked SUV, after having received tips regarding on-going drug and gun activity.[5]  (Morris Aff. (Doc. # 40, Ex. 1); Mashburn Aff. (Doc. # 40, Ex. 2).)  Mr. Haigler, upon seeing the police vehicle pulling to a stop, walked inside to avoid the officers because he had five outstanding capias warrants.[6]  (Haigler Dep. 42– 43.)  Then, a black SUV pulled up

---

[4]  The actual facts may be different than those stated here.  *See Lee*, 284 F.3d at 1190.

[5]  Mr. Haigler stated he has heard gunshots at Smith's residence "maybe like every other night."  (Haigler Dep. 78–79.)  Mrs. Smith says she hears them on the weekends but not every weekend.  (C. Smith Dep. 107.)

[6]  Cpls. Morris and Mashburn both state that Mr. Haigler "fled" into the apartment. (Morris Aff.; Mashburn Aff.)

behind Mrs. Smith's truck, and Cpl. Morris, dressed in all black, ran up to Mrs. Smith's apartment door.[7]  (C. Smith Dep. 27.)

Cpl. Morris kicked in the door, went inside, and pushed Mr. Haigler against the wall.  Cpl. Morris put Mr. Haigler's hands behind his back and said, "Don't move, where the mother------- drugs at?"  (Haigler Dep. 45.)  Then, Cpl. Mashburn came into the house.  Cpl. Morris told Cpl. Mashburn to handcuff Mr. Haigler because he had seen the drug transaction.  (Haigler Dep. 46–47.)  Cpl. Morris pulled out his taser, told Mr. Haigler not to move and kept asking where the drugs were.  (Haigler Dep. 47–48.)  Mr. Haigler was not moving or resisting during this time.[8]  (Haigler Dep. 48.)  Mr. Haigler told Cpl. Morris that he did not sell drugs and that all he did was work.  (Haigler Dep. 48.)  Cpl. Morris turned Mr. Haigler around and pointed his taser at Mr. Haigler's chest while repeatedly telling him not to move.  (Haigler Dep. 48.)  Then Cpl. Mashburn handcuffed Mr. Haigler.[9]  (Haigler Dep. 48, 52.)  The other

---

[7] Cpls. Morris and Mashburn state that, while they were observing the area from the SUV, they saw Mr. Haigler, who was sitting in a chair in front of an apartment, reach into his shirt pocket and pull out what they believed to be marijuana.  (Morris Aff.; Mashburn Aff.)  Mr. Haigler insists he did not have drugs on him, did not pick up drugs, and did not see anyone with drugs.  (Haigler Dep. 79.)  Other witnesses also state they never saw Mr. Haigler reach into his pocket or pull anything out of it while on the front porch.  (Brown Aff. 14 (Doc. # 30, Aff. Attach.); Williams Aff 22 (Doc. # 30, Aff. Attach.).)

[8] Cpls. Morris and Mashburn stated that Mr. Haigler was struggling with the officers during the search.  (Morris Aff.; Mashburn Aff.)

[9] Corporal Morris states that he searched Mr. Haigler and did not find drugs so Cpl. Mashburn looked under the living room sofa and found the marijuana there.  They then placed

officers then searched the apartment.[10]  (Haigler Dep. 48.)  During the search, the officers pushed over Mrs. Smith's sofa and loveseat, pulled everything out of the closets, knocked all the cereal off the top of the refrigerator, pulled the flowers down, and knocked over a lamp and pictures.  (C. Smith Aff. 7 (Doc. # 30, Aff. Attach.).)

While Cpl. Mashburn handcuffed Mr. Haigler, Cpl. Morris went into Mrs. Smith's kitchen.  (Haigler Dep. 52.)  After Mr. Haigler was handcuffed, Cpl. Morris came out of the kitchen, elbowed Mr. Haigler in the side, and said, "Where the mother------- drugs at; you know where the drugs are at."  (Haigler Dep. 52–53.) Then, another officer pushed Mr. Haigler.  (Haigler Dep. 53.)

During Mr. Haigler's arrest, Mrs. Smith kept telling the officers that Mr. Haigler did not sell drugs, that he was lawfully employed and that she did not understand why they were arresting Mr. Haigler. (C. Smith Dep. 57.) Cpl. Mashburn pushed Mrs. Smith in the chest and told her to "shut the ---- up."[11]  (C. Smith Dep. 57.) Mrs. Smith never touched, threw anything at or hit any of the officers. (C. Smith Dep. 58.)

---

Mr. Haigler under arrest.  (Morris Aff.; Mashburn Aff.)

[10] At least one other officer, Cpl. Davis, was also in the apartment; however he is not a defendant in this suit.

[11] Both Cpls. Morris and Mashburn stated that they never saw anyone strike or shove Mrs. Smith.  (Morris Aff.; Mashburn Aff.)

While Cpls. Morris and Mashburn were in Mrs. Smith's apartment, no one was allowed to go in or out.  (C. Smith Aff. 7; I. Smith Dep. 20 (Doc. # 40, Ex. 5).)  One officer stayed outside with the men on the porch.  (I. Smith Dep. 20.)  The men on the porch were searched and then told to leave after no contraband was found.  (Brown Dep. 23 (Doc. # 40, Ex. 6).)  One of the men on the porch threw a cellophane bag of marijuana on the ground before the officer searched him.  (Brown Dep. 26.)  The officers did not see the bag until at least thirty minutes later.[12]  (Brown Dep. 26.)

Cpl. Morris brought Mr. Haigler outside in handcuffs and threw Mr. Haigler to the ground.  (Haigler Dep. 60.)  Mr. Haigler was not resisting and had been walking normally.  (Haigler Dep. 60.)  During this time, Mr. Smith told the officers that their actions were not necessary and that they did not need to be so rough with Mr. Haigler.  (I. Smith Aff. ¶ 5. (Doc. # 43, Ex. 2).)  Mr. Smith and another friend, Ms. Lynne Williams, told the officers that Mr. Haigler took medicine for seizures and that the force used could cause him to have a seizure.  (Williams Aff. 22; I. Smith Aff. ¶ 6.)  After Mr. Smith said this, Cpl. Mashburn pulled out his taser and pointed it at Mr. Smith's face saying, "Shut the ---- up or I'll shoot you in your mother------- face!"  (I. Smith Aff. ¶ 5.)  The officers made Mr. Haigler lie down on the ground for a

---

[12]  From the record, it is unclear which officer found the bag of marijuana on the ground outside and at what point in the timeline.

minute until the "little short" officer said, "I got him."  (Haigler Dep. 60.)  Then, the

officers picked up Mr. Haigler, threw him against the truck and threw him into the

truck.  (Haigler Dep. 60–6; Haigler Aff. ¶ 4 (Doc. # 30, Aff. Attach.).)  During this

time, Mr. Haigler stated that he heard the "little short" officer talking on the phone

and saying that Mr. Haigler had been arrested for no reason.  (Haigler Dep. 61 ("We

just put one of the guys [away]; we don't have nothing on him.").)  On the ride to the

station, the officers beat Mr. Haigler and poked his side and ribs with their clubs.

(Haigler Aff. ¶ 5.)

After being put in jail, Mr. Haigler complained of knee pain in his right knee

from being thrown to the ground.  (Attach. A to Hopkins Aff. (Doc. # 40, Ex. 7).)  He

was given ibuprofen for his pain.  (Attach. A to Hopkins Aff.)  In his Initial Inmate

Health Assessment, Mr. Haigler's general appearance was marked as good but that

he walked with a limp from right knee pain and his left thumb was swollen at the

joint. (Attach. B to Hopkins Aff.)  Mr. Haigler was charged with unlawful possession

of marijuana in the second degree.  (Doc. # 30, Ex. 1.)[13]

On August 10, 2010, after he was released on bond, Mr. Haigler went to a

hospital emergency room for a thumb injury and back soreness.  (Doc. # 40, Ex. 8.)

_____

[13] From the record, the outcome of Mr. Haigler's charge of unlawful possession of
marijuana is unclear.

He was diagnosed with a sprained finger, for which he received a splint.  Mr. Haigler stated that he had cuts and bruises on his face and body and that he was sore all over. (Haigler Aff. ¶ 7.)

Also on August 10, 2010, Mr. and Mrs. Smith filed a complaint with the City of Montgomery Internal Affairs Department regarding the August 7, 2010 incident. (I. Smith Aff. ¶ 8.)  On September 20, 2010, Mr. and Mrs. Smith, along with their friend Ms. Barbara Mays, spoke with then acting Chief Murphy regarding the incident.  (Mays Aff. ¶ 1 (Doc. # 30, Aff. Attach.).)  During the meeting, Chief Murphy expressed concerns about how the recent academy graduates "have no real world experiences, and . . . sometimes are not prepared to deal with many of the emotions, attitudes, and behaviors they face from the public on a daily basis." (Mays Aff. ¶ 3.) Chief Murphy explained that changing the colors of their uniforms can help diffuse situations and that he will focus on this as the new Montgomery Police Chief. (Mays Aff. ¶ 3.)  Chief Murphy told the Smiths that he would send someone from the city to repair their door and wall, and the door and wall were fixed that afternoon. (Mays Aff. ¶ 4; I. Smith Aff. ¶ 10.)

During this meeting, Chief Murphy told the Smiths and Ms. Mays that the department did not have a "solid case" against Mr. Haigler and that his officers did not find drugs at the time of their search.  (Mays Aff. ¶ 6.)  He also performed a

10

demonstration to show them that the officers could not have seen what was in Mr. Haigler's hand.  (Mays Aff. ¶ 6; I. Smith Aff. ¶ 9; *see supra* note 7.)  Either at this meeting or another (it is unclear when this event took place), Chief Murphy asked the Smiths to have Mr. Haigler sign a release form stating that Mr. Haigler's possession of marijuana charge would be dismissed if Mr. Haigler would not sue or hold the city liable for any claims.  (I. Smith Aff. ¶ 11; Doc. # 30, Ex. 2.)  Mr. Haigler did not sign this form.

Since the incident, Mrs. Smith cannot sleep regularly because she has nightmares about the incident and her knee hurts.  (C. Smith Aff. 7–8.)  She has to take sleeping pills to sleep.  (I. Smith Aff. ¶ 13.)  The medicine she took for her knee no longer helps with the pain after she was pushed by Cpl. Mashburn.  Mrs. Smith had to have surgery on her knee.  (C. Smith Aff. 7–8.)  Mr. Haigler also has had trouble sleeping since the incident.  (Haigler Aff. ¶ 8.)

Seeking redress, Mrs. Smith and Mr. Haigler filed separate actions on November 29, 2010.  The two cases were consolidated on December 28, 2010.  (*See* Doc. 17.)  The governing Amended Complaint alleges § 1983 claims of excessive force, unlawful arrest, filing a false report or complaint, failure to supervise police officers and false imprisonment, § 1985 claims for conspiracy to interfere with civil rights and a fraud claim under Alabama law against all Defendants in their individual

and official capacities.   Plaintiffs seek compensatory and punitive damages; employment termination of all officers who participated in the August 7, 2010 incident; restraining orders on the Montgomery Police Officers to protect Plaintiffs, Plaintiffs' witnesses, and Plaintiffs' counsel; and attorney's fees.

## V.  DISCUSSION

### A.   **Preliminary Matters**

Plaintiffs concede that summary judgment is due to be entered in Defendants' favor on their § 1985 conspiracy claims (Counts E and F) and their fraud claims under Alabama law (Count H).  (Pls.' Resp. Br. 6 (Doc. # 43).)  Additionally, at the October 19, 2011 pretrial hearing, Plaintiffs' counsel agreed that Defendant Mayor Todd Strange may be dismissed from this action.  Thus, summary judgment will be entered on all claims against Mayor Strange.

Plaintiffs have sued Defendants Kevin Murphy, Chief of Police of the City of Montgomery; and Cpls. Morris and Mashburn, officers for the Montgomery Police Department, in both their official and individual capacities.  "Under the Eleventh Amendment, state officials sued for damages in their official capacity are immune from suit in federal court."  *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (stating that "an official-capacity suit is, in all respects other than name, to be treated as a suit

12

against the entity"). Thus, the individual Defendants are entitled to absolute immunity with regard to any claims for damages against them in their official capacities. Similarly, the individual Defendants in their official capacities are not "persons" for purposes of § 1983 monetary relief. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989).

Plaintiffs' remaining claims against Defendants in their individual capacities all arise under § 1983. To establish § 1983 individual liability, a plaintiff must demonstrate that (1) he or she was deprived of a right secured by the United States Constitution, and (2) the act or omission causing the deprivation was committed by an individual acting under color of state law. *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987).

Given the number of defendants and claims in this case, the opinion will be broken up by defendant. Part V.B. will address Plaintiffs' claims against Cpls. Morris and Mashburn, including Cpls. Morris's and Mashburn's qualified immunity defense. Part V.C. will address all of Plaintiffs' claims against Chief Murphy. Finally, Part V.D. will address all of Plaintiffs' claims against the City, including the City's municipal liability defense.

13

**B.   Cpls.  Morris and Mashburn in Their Individual Capacities**

Cpls. Morris and Mashburn assert qualified immunity as a defense to Mr.
Haigler's Fourth Amendment claims of excessive force, false arrest, and filing a false
report and Mrs. Smith's Fourth Amendment claims of excessive force against them
in their individual capacities.  First, general principles on the law governing qualified
immunity will be given, followed by an analysis as to whether the corporals are
entitled to qualified immunity on each § 1983 claim.

**1.    *General Principles of Qualified Immunity***

"The doctrine of qualified immunity provides that government officials
performing discretionary functions generally are shielded from liability for civil
damages" unless they have violated a clearly established constitutional right.
*Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010) (citation and
internal quotation marks omitted).  A qualified immunity determination requires the
application of a multi-part test.  First, a defendant must establish that he or she was
acting within his or her discretionary authority as a public employee when the
conduct in question occurred.  *Id.* at 1158.  Next, a plaintiff must demonstrate "'that:
(1) the defendant violated a constitutional right, and (2) this right was clearly
established at the time of the alleged violation.'"  *Id.* (quoting *Holloman v. Harland*,
370 F.3d 1252, 1264 (11th Cir. 2004)).

14

In previous years, this two-step inquiry had to be conducted in order.  That is, the court had to decide whether a right existed (and whether it was violated) before deciding whether it was clearly established.  Now, courts may "'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'"  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Here, the court proceeds in the sequence set forth in *Townsend*.

It is undisputed that Cpls. Morris and Mashburn were acting within their discretionary authority as officers of the Montgomery police department at all times material to this lawsuit.  (Defs.' Summ. J. Br. 22 (Doc. # 41).)  Thus, the burden shifts to Plaintiffs to show that Cpls. Morris and Mashburn are stripped of qualified immunity based on their actions.

2.     *Fourth Amendment Claims for Unlawful Arrest and False Imprisonment (Counts B & G)*[14]

These claims relate only to Mr. Haigler.  "There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment."  *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997) (citing *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)).  "[I]f an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making the arrest."  *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).  Likewise, "the damages recoverable on an unlawful arrest claim 'include damages suffered because of the use of force in effecting the arrest.'"  *Id.* (citing *Williamson v. Mills*, 65 F.3d 155, 158–59 (11th Cir. 1995)).

"Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy

---

[14]  Because Mr. Haigler's § 1983 claims of false arrest and false imprisonment are both dependent on the absence of probable cause, the two claims will be analyzed together.  *See Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009) ("Our precedents establish that a claim of false imprisonment . . . depends on an absence of probable cause . . . . Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest . . . ."); *see also Sada v. City of Altamonte Springs*, No. 11-10203, 2011 WL 2749664, at *5 (11th Cir. July 15, 2011) ("[B]ecause the officers had probable cause to arrest Sada for battery, the district court did not err in granting summary judgment on Sada's federal constitutional claims and state law false arrest/false imprisonment claims."); *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (stating that probable cause constitutes an absolute bar to § 1983 claims alleging false arrest).

information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (per curiam) (internal quotation marks and citations omitted). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972).

### a.   Qualified Immunity and Unlawful Arrest:  Arguable Probable Cause

"While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007).  For qualified immunity on a claim of unlawful arrest, an officer need not have actual probable cause, but only *arguable* probable cause.  *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003).  Arguable probable cause exists where "'reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed to arrest [the] [p]laintiff . . . .'"  *Kingsland v. City of Miami, Fla.*, 382 F.3d 1220, 1232 (11th Cir. 2004) (quoting *Von Stein*, 904 F.2d at 579).  The plaintiff bears the burden to "demonstrate that no reasonable officer could have found probable cause under the totality of the

circumstances." *Id.* Thus, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Holmes*, 321 F.3d at 1079 (internal quotations marks and citations omitted).

Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern. *Skop*, 485 F.3d at 1137–38. Arguable probable cause does not, however, require an arresting officer to establish every element of a crime before making an arrest, because such a requirement "would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1303 (11th Cir. 2001). Thus, the inquiry is "whether [the defendant] violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually constituted a crime." *Id.* at 1303 n.8.

Additionally, qualified immunity will protect officers who make good faith mistakes. *Post v. City of Fort Lauderdale, Fla.*, 7 F.3d 1552, 1558 (11th Cir. 1993) (granting qualified immunity on the basis of arguable probable cause where the officers erroneously counted people in excess of a restaurant's maximum capacity), *modified*, 14 F.3d 583 (11th Cir. 1994) (per curiam). However, it will not protect officers whose conduct "creates factual issues as to their honesty and credibility."

18

*Kingsland*, 382 F. 3d at 1233; *see also Holmes*, 321 F.3d at 1083–84 (reversing the grant of qualified immunity and summary judgment because factual questions existed whether officers filed a recklessly false application for an arrest warrant).

On the offense of unlawful possession of marijuana in the second degree for which Mr. Haigler was arrested, Alabama Code § 13A-11-7 provides that:

> (a) A person commits the crime of unlawful possession of marihuana in the second degree if, except as otherwise authorized, he possesses marihuana for his personal use only.

> (b) Unlawful possession of marihuana in the second degree is a Class A misdemeanor.

The key for this crime is possession of marijuana by the arrestee. Thus, the inquiry is whether Cpls. Morris and Mashburn had arguable probable cause that Mr. Haigler possessed marijuana.

### b.    Whether Cpls. Morris and Mashburn Had Arguable Probable Cause to Arrest Mr. Haigler for Possession of Marijuana

Defendants' argument focuses on arguable probable cause for Cpls. Morris's and Mashburn's warrantless entry into Mrs. Smith's apartment. Defendants argue they had arguable probable cause to arrest Mr. Haigler for this offense because Cpl. Morris thought he saw Mr. Haigler pull marijuana out of his shirt pocket while Mr. Haigler was sitting outside Mrs. Smith's apartment and Mr. Haigler was in an area

known for drug dealing and where gunfire could often be heard.  (Defs.' Summ. J. Br. 8–9.)  According to Defendants, these facts provided a hot pursuit justification for entering Mrs. Smith's apartment when Mr. Haigler went inside.   However, Mr. Haigler's unlawful arrest claim is not based on Cpls. Morris's and Mashburn's warrantless entry into Mrs. Smith's apartment.[15]   (*See* Pls.' Resp. Br. 2 (Doc. # 43).) Instead, Mr. Haigler's basis for the unlawful arrest claim is that Cpls. Morris and Mashburn falsified facts to gain probable cause to justify the warrantless entry and arrest.

Mr. Haigler points to Cpl. Morris's report, which states that Cpl. Mashburn found marijuana under the couch in Mrs. Smith's apartment before arresting Mr. Haigler.  (Doc. # 30, Ex. 1.)  However, Mrs. Smith and Mr. Haigler (who were both inside the apartment when the marijuana was allegedly found under Mrs. Smith's couch) submitted affidavits stating that the officers never found marijuana under the couch or even in Mrs. Smith's apartment.   In addition, Mr. Haigler submitted

---

[15]  Plaintiffs' brief states that "[e]ven if the Defendants did ***mistakenly believe so***, that would entitle them to **pursue and detain** Mr. Haigler inside the residence, but ***not to subsequently arrest him***."  (Doc. # 43 at 2.)  Defendants' reliance on *United States v. Echevarria*, 238 F. App'x 424 (11th Cir. 2007), is misplaced.  In *Echevarria*, the Eleventh Circuit found that the warrantless entry into a defendant's trailer and the subsequent search came within the exigent circumstances exception to the warrant requirement.  *Id.* at 425.  However, *Echevarria* dealt with whether the officers' entry into defendant's residence was valid, not with whether the officers had probable cause to arrest the defendant.  Probable cause to arrest is the disputed issue in this case.

evidence that Chief Murphy indicated the officers did not find drugs in the apartment or on Mr. Haigler's person.

Cpls. Morris and Mashburn are not entitled to qualified immunity if their conduct violates Mr. Haigler's clearly established rights. It is clearly established that "[f]alsifying facts to establish probable cause is patently unconstitutional . . . ." *Kingsland*, 382 F.3d at 1232; *see also Williams v. Miami-Dade Police Dep't*, 297 F. App'x 941, 946 (11th Cir. 2008). It must then be determined if there is evidence creating a genuine issue of material fact that, under the totality of the circumstances, the officers' initial observations of Mr. Haigler as he sat outside his mother's apartment were objectively reasonable.

Based on the totality of the circumstances, a reasonable officer could not have objectively believed that Mr. Haigler possessed marijuana. Under Plaintiffs' version of the events, the only facts known to Cpls. Morris and Mashburn at the time of Mr. Haigler's arrest were that Mr. Haigler was hanging out with friends in an area known for guns and drugs, and he walked into an apartment upon seeing Jump Street's vehicles. Under these facts, "a link between the suspected criminal activity and [Mr. Haigler]" is missing. *Williamson*, 65 F.3d at 158. Mr. Haigler's activities of hanging out on a porch with friends and walking inside is a "facially innocent act." *Id.* (holding that "[t]aking photographs at a public event is a facially innocent act" and

that "[t]he mere fact that [these] photographs *could* have been used for unlawful activity . . . [was] not enough to establish even arguable probable cause" for arresting the photographer).

Mr. Haigler raises a question of fact as to whether arguable probable cause existed to believe that from the officers' vantage point they objectively could have ascertained that Mr. Haigler pulled marijuana out of his shirt pocket. (*See supra* note 7; *see also* Mays Aff. ¶ 6; I. Smith Aff. ¶ 9.)  Moreover, whether Cpls. Morris and Mashburn found marijuana under Mrs. Smith's couch, after having found no marijuana on Mr. Haigler, is a question of fact for the jury to decide.  Thus, qualified immunity must be denied at this time on Mr. Haigler's Fourth Amendment claims of unlawful arrest and false imprisonment.  *See Kingsland*, 382 F.3d at 1226–27.

### 3.    *Fourth Amendment Claim for Excessive Force (Count A)*

This claim is brought by both Plaintiffs.  As will be seen, because Mrs. Smith was not arrested, the analysis for excessive force in her case differs from the analysis for excessive force in the case of Mr. Haigler, who was arrested.

The Fourth Amendment's "objective reasonableness" standard governs whether a use of force is excessive.  *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008); *see also Lee* 284 F.3d at 1197.  The reasonableness inquiry requires the court to "carefully balance 'the nature and quality of the intrusion on the individual's

22

Fourth Amendment interests' against 'the countervailing governmental interests at stake.'" *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

First, to determine whether the force applied was reasonable, the court looks "at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009). The quantum of force used should be measured against "the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade arrest by flight." *Oliver*, 586 F.3d at 905 (citing *Lee*, 284 F.3d at 1197–98); *see also McCullough*, 559 F.3d at 1206.

Second, the court considers "'(1) the need for the application of force, (2) the relationship between the need and the amount of force used, [and] (3) the extent of the injury inflicted.'" *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986), *abrogated in part by Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) (recognizing that *Leslie's* fourth factor, the subjective inquiry into the officer's motive, was invalidated by *Graham*); *see also Lee*, 284 F.3d at 1198 n.7 (discussing

the continuing validity of the other three *Leslie* factors). However, "the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at 1257.

Third, "[F]ourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Furthermore, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. *Id.* (citation and internal quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* Hence, "[u]se of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, [instead of] with the 20/20 vision of hindsight." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (citation and internal quotation marks omitted).

Finally, in conducting the reasonableness inquiry based on Plaintiffs' facts, the Eleventh Circuit has recognized that an officer's use of force is more likely to be

unlawful when it occurs "after the arrest [has] been fully effected, the arrestee completely secured, and all danger vitiated." *Lee*, 284 F.3d at 1199–1200.

### a. Qualified Immunity and Mr. Haigler's Excessive Force Claim

Assuming for purposes of this analysis that his arrest was legal, Mr. Haigler asserts claims of excessive force in violation of the Fourth Amendment against Cpls. Morris and Mashburn.[16]   The corporals have asserted qualified immunity on this claim.  Under Plaintiffs' version of the events on August 7, 2010, Mr. Haigler can establish that Cpls. Morris and Mashburn violated his clearly established Fourth Amendment right to be free from excessive force.  Because there are genuine issues of material fact surrounding the incident, Cpls. Morris and Mashburn are not entitled to qualified immunity at this time.

### i. Whether Cpls. Morris and Mashburn Violated Mr. Haigler's Right to Be Free from Excessive Force Under the Fourth Amendment

Under Fourth Amendment law, a distinction is made between the type of force allowed to effectuate arrest and the type of force allowed after arrest.  Cpls. Morris and Mashburn arrested Mr. Haigler for unlawful possession of marijuana, a Class A

---

[16]  As mentioned previously, if Mr. Haigler was arrested without probable cause, his excessive force claim would be subsumed by his unlawful arrest claim.  *See Bashir*, 445 F.3d at 1332.

misdemeanor in Alabama. *See* Ala. Code § 13A-11-7. Not only has Fourth Amendment jurisprudence long recognized that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, but the Eleventh Circuit "has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003). "In the Eleventh Circuit, [courts] recognize that the typical arrest involves some force and injury." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002). For even minor offenses, police officers are authorized to use physical restraint, handcuffs, and to push suspects. *See, e.g.*, *Nolin*, 207 F.3d at 1257 (no constitutional violation to grab suspect, push him against a van, search his groin in an uncomfortable manner, and place him in handcuffs); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (per curiam) (no constitutional violation to slam plaintiff against wall, kick plaintiff's legs apart, and require plaintiff to raise arms above his head); *Gold v. City of Miami*, 121 F.3d 1442, 1446–47 (11th Cir. 1997) (per curiam) (no constitutional violation for affixing handcuffs too tightly on disorderly conduct arrestee); *Post*, 7 F.3d at 1559–60 (not excessive force to arrest a plaintiff for building code violation by pushing him against a wall, applying a chokehold, and handcuffing him even though

plaintiff was not resisting); *cf. Lee*, 284 F.3d at 1191, 1198 (finding a constitutional violation for the defendant's unreasonable use of force after the plaintiff was arrested and secured, but making no such finding on the defendant's use of force in subduing and securing the plaintiff by pulling her out of her car by her wrist, shoving her against the car, throwing her hands on top of the hood, and then handcuffing her).

To effectuate the arrest of Mr. Haigler, Cpl. Morris pushed Mr. Haigler against a wall, put Mr. Haigler's hands behind his back, and pulled out his taser and pointed it toward Mr. Haigler's chest.[17]  Against the legal backdrop set out above, these facts are insufficient to establish that the force used to effectuate Mr. Haigler's arrest violated the Fourth Amendment.  Thus, no Fourth Amendment violation has been demonstrated by Mr. Haigler regarding the force used by Cpls. Morris and Mashburn to make his arrest.

However, after an arrest is effectuated and the arrestee is secured, the use of force is more likely to be unlawful.  *Lee*, 284 F.3d at 1199–1200.  After Mr. Haigler was arrested, there is evidence that Mr. Haigler was elbowed in the side, pushed, thrown on the ground, forced to stay on the ground, then picked up and thrown against a truck, thrown into the truck, and beaten and poked in his side and ribs with

---

[17]  There is no evidence that Cpl. Mashburn touched Mr. Haigler or activated the taser prior to handcuffing him.  Thus, Cpl. Mashburn cannot be found liable on an excessive force claim for actions that occurred prior to the arrest.

the officers' clubs on the way to the station.  Each *Graham* factor will be analyzed in

turn to decide whether the force used by Cpls. Morris and Mashburn after Mr.

Haigler's arrest was reasonable.[18]

The first factor is the severity of the crime at issue.  *Graham*, 490 U.S. at 396.

Mr. Haigler was arrested for unlawful possession of marijuana, which is a Class A

misdemeanor in Alabama.  (Ala. Code 1975 § 13A-12-214(b); Ex. 1, Pls.' Am.

Compl.)  As a general rule, "more force is appropriate for a more serious offense and

less force is appropriate for a less serious one."  *Lee*, 284 F.3d at 1198.  Because this

is a misdemeanor, less force is generally appropriate.

The second factor is whether Mr. Haigler posed an immediate threat to the

safety of the officers or others.  *See Graham*, 490 U.S. at 396.  Defendants argue that

there was an immediate threat to their safety because they were in an area known for

illegal drug and weapons activities and were inside an unfamiliar home.  (Def.'s

Summ. J. Br. 16.)  While this may have been true before the arrest, after the officers

had effectuated the arrest, there is no evidence that Mr. Haigler was a threat to their

safety.  Mr. Haigler had already been searched, and no weapons or drugs were found

on him.  Mr. Haigler was not trying to flee or struggling.  He was also in handcuffs

---

[18]  From the record, it is unclear which officer did what to Mr. Haigler.  The only clear action taken by a specific officer is that Cpl. Morris elbowed Mr. Haigler in the side after he was arrested.

and being watched by another officer.  Finally, Mr. Haigler and Mrs. Smith were the only ones in the apartment with at least three officers.  Thus, on the summary judgment facts, Mr. Haigler did not pose a threat to the safety of Cpls. Morris and Mashburn.

The third factor is whether Mr. Haigler was actively resisting arrest or attempting to evade by flight.  *See Graham*, 490 U.S. at 396.  If Mr. Haigler's version of the events is credited, as it must be, he was not struggling or resisting arrest.  Cpls. Mashburn and Morris say that Mr. Haigler was struggling during the arrest.  However, all accounts from Plaintiffs indicate that there were no signs of struggle by Mr. Haigler.  While Mr. Haigler did walk inside upon seeing Jump Street's SUV, he did not run nor did he try to escape once the officers were inside Mrs. Smith's apartment.

Because of the lack of severity of the crime and the fact that Mr. Haigler was not resisting arrest and did not pose a danger to the officers because he was arrested and secured, there was no need to use post-arrest force on Mr. Haigler.  Throwing Mr. Haigler on the ground, against the truck, and into the truck, as well as continuing to poke and hit him with clubs on the way to the station, would be excessive in light of Mr. Haigler being in handcuffs and not resisting arrest.

However, even if the force used is found to be unnecessary, the *de minimis* principle may apply. *Nolin*, 207 F.3d at 1257 (reaffirming that after *Graham*, the *de minimis* principle still applies).[19]  Under the *de minimis* principle, "a minimal amount of force and injury . . . will not defeat an officer's immunity in an excessive force case." *Id.* at 1258.  Thus, even if the force was unnecessary, if "the actual force used and the injury inflicted were both minor in nature[,] . . . the application of the excessive force standard would not inevitably lead an official in [the defendant's] position to conclude that the force was unlawful." *Id.* at 1256–57 (discussing and quoting *Jones*, 121 F.3d at 1460–61).

Mr. Haigler was walking with a limp from pain to his right knee after being thrown on the ground and had a swollen left thumb joint.  He was given ibuprofen.  Three days later, he went to the emergency room for back soreness and swelling of his thumb.  He was diagnosed with a sprained thumb, and his thumb was splinted.  Mr. Haigler also attests that he had bruising and cuts on his face and body.  The Eleventh Circuit has classified minor bruising, skin abrasions, and pain experienced during the search or arrest that required minor medical treatment as minor injury.

---

[19]  In reversing a district court's ruling to the contrary, *Nolin* reaffirmed the *de minimis* principle and three circuit opinions that applied it after *Graham* to reverse district courts that denied qualified immunity.  207 F.3d at 1257–58.  According to *Nolin*, one of those cases, "*Post*[,] refined *Graham* by concluding that in making the highly fact-intensive excessive force inquiry, a court may conclude that an officer retains qualified immunity when the facts show a minimal amount of force combined with a minor or nonexistent injury." *Id.* at 1257 n.3.

*See, e.g.*, *Vinyard*, 311 F.3d at 1349 n.13 (noting a strong argument that "minor bruising" is *de minimis* injury); *Nolin*, 207 F.3d at 1258 n.4 (finding *de minimis* force when "minor bruising" along with minimal force); *Jones*, 121 F.3d at 1460 (finding that the plaintiff's pain from lifting his arms because of a prior stroke, and his pain from an arthritic knee after having his legs kicked apart, which required minor medical treatment three days later, was "minor" injury); *Gold*, 121 F.3d at 1446 (describing "skin abrasions" as a minor injury, though they were "skin abrasions for which [the plaintiff] did not seek medical treatment"). While Mr. Haigler did need medical attention, his injuries were minor under the controlling law. He did not have any broken bones or open wounds, was not prescribed any medication other than ibuprofen and only needed a splint put on his thumb.

However, minor injuries do not automatically make the force used *de minimus*. *Lee*, 284 F.3d at 1200. "[O]bjectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm." *Id.* In the cases where the *de minimus* principle was applied, the force and injury sustained were in effectuating an arrest. *See Rodriguez*, 280 F.3d at 1345 (injury occurred during handcuffing); *Nolin*, 207 F.3d at 1255–57 (plaintiff grabbed, thrown against van, and handcuffed before arrest); *Jones*, 121 F.3d at 1458, 1460–61 (plaintiff slammed against wall and

31

searched as officers carried out arrest); *Gold*, 121 F.3d at 1446–47 (minor injury caused solely by tight handcuffs); *Post*, 7 F.3d at 1556, 1559–60 (arrestee pushed against wall when continuing to speak despite being ordered by officer to stop talking).  Here, the force that caused the injuries occurred after the arrest.

In *Lee*, the Eleventh Circuit found that slamming an arrestee's head into a car trunk after the "arrest ha[d] been fully secured and any potential danger or risk of flight vitiated" was severe and unnecessary force, even though the arrestee's injuries were only bruises, aching wrists, and bilateral wrist trauma.  284 F.3d at 1200. Similarly, in *Vinyard*, the Eleventh Circuit found an excessive force violation when an officer grabbed "the arrested, secured and handcuffed [plaintiff] forcibly enough to bruise her arm and breast and then us[ed] pepper spray" on her while she was in the back of the police car.  311 F.3d at 1349.

Like in *Vinyard* and *Lee*, Mr. Haigler had been arrested, secured and handcuffed when the officers inflicted further force on him.  In addition, he was in the presence of at least three officers and never resisted arrest or attempted to flee once secured.  Despite these facts, the officers dragged him outside in handcuffs, threw him on the ground, picked him up and threw him against the truck, threw him inside the truck, and then beat him with their clubs on the way to the station house. This force does not become *de minimus* simply because Cpls. Mashburn and Morris

were fortunate that Mr. Haigler did not suffer more severe injuries.  *See Lee*, 284 F.3d at 1200.

Based on the facts viewed in the light most favorable to Mr. Haigler, he has raised a genuine issue of material fact as to whether Cpls. Morris and Mashburn violated his Fourth Amendment right to be free from excessive force.  Having shown that the corporals "violated a constitutional right," *Townsend*, 601 F.3d at 1157, Mr. Haigler has satisfied the first prong of the qualified immunity defense.  The analysis now turns to the second prong of the qualified immunity defense.

### ii.    Whether the Right Violated by Cpls. Morris and Mashburn Was Clearly Established

In order to overcome qualified immunity, Plaintiffs must also demonstrate that as of August 7, 2010, the law was clearly established that the force used by Cpls. Morris and Mashburn was excessive.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated by Pearson*, 555 U.S. at 236 (holding that judges may decide which prong of the *Saucier* qualified immunity test to address first).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.  Put another way, did the state of the law in 2010 provide Cpls. Morris and Mashburn with fair warning that their treatment of Mr.

33

Haigler after he was arrested was unconstitutional?  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Plaintiffs cite *Lee* and *Vinyard* in defending Mr. Haigler's excessive force claim against qualified immunity.  These cases are similar to Mr. Haigler's claim because, as stated *supra* in Part V.B.2.a.i., Cpls. Morris and Mashburn used unnecessary force against Mr. Haigler after he was arrested, secured and handcuffed. *Lee* and *Vinyard* were both issued by the Eleventh Circuit in 2002.  In 2010, the officers would have had fair warning that throwing and beating an arrestee who was arrested for a misdemeanor and not resisting arrest would violate that arrestee's Fourth Amendment rights.  Thus, Cpls. Morris and Mashburn are not entitled to qualified immunity because there is a genuine issue of material fact as to whether Mr. Haigler offered any resistance once handcuffed, and the right to be free from excessive force on these facts was clearly established in 2010.  *See Smith v. Mattox*, 127 F.3d 1416, 1420 (11th Cir. 1997) (denying summary judgment on the issue of qualified immunity where it was unclear if the arrestee continued to resist arrest).

### b.    Mrs. Smith's Excessive Force Claim

Mrs. Smith also claims excessive force in violation of the Fourth Amendment against Cpl. Mashburn.[20]   Cpl. Mashburn has asserted qualified immunity on this claim.  Cpl. Mashburn is not entitled to qualified immunity because Mrs. Smith can show that he violated her clearly established Fourth Amendment right to be free from excessive force and there is a genuine issue of material fact as to whether Mrs. Smith was pushed.

### i.    Whether Cpl. Mashburn Violated Mrs. Smith's Fourth Amendment Right to Be Free from Excessive Force

A claim of excessive force under the Fourth Amendment requires a seizure. *Graham*, 490 U.S. at 394 ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. . . .  In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments . . . .").  The Supreme Court in *Graham* noted that "[a] 'seizure' triggering the Fourth

---

[20]  Plaintiffs' Amended Complaint makes a general allegation of excessive force. However, the Amended Complaint states that Cpl. Mashburn was the one who pushed Mrs. Smith, and there is no evidence to the contrary.  Thus summary judgment is due to be entered in Cpl. Morris's favor on Mrs. Smith's Fourth Amendment excessive force claim.

35

Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Id.* at 395 n.10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  Put another way, an individual is seized if, "in view of all the surrounding circumstances, a reasonable person would believe that he was not free to leave." *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991) (citing *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)).

Here, the evidence raises a genuine issue of material fact that Mrs. Smith was seized.  An officer kicked in Mrs. Smith's apartment door, while yelling, proceeded to search her home, told her she could not leave, and did not allow anyone to enter or exit the apartment.  On these facts, a reasonable person would believe she was not free to leave.

The evidence also raises a genuine issue of material fact as to whether the force used by Cpl. Mashburn was excessive.  According to Mrs. Smith, she was not yelling at the officers nor did she touch, hit or throw anything at the officers.  She simply told the officers that Mr. Haigler did not sell drugs, that he worked for a living and that she did not understand why they were arresting him.  Mrs. Smith also was not being arrested and was not a suspect.  Despite her nonaggressive behavior, Cpl. Mashburn pushed Mrs. Smith in the chest and told her to "shut the ---- up," causing her to

almost fall into a table and twist her knee to prevent the fall.  This amount of force is unreasonable.  *See Payton v. City of Florence*, 413 F. App'x 126, 133 (11th Cir. 2011) (finding excessive force where officers pulled plaintiff out of a doorway, grabbed her thumb and pulled it up behind her back past her shoulder, where the plaintiff was not being arrested, was not "being belligerent and made no aggressive movement toward the officers"); *see also Jones v. Buchanan*, 325 F.3d 520, 531 (4th Cir. 2003) (finding excessive force where the plaintiff voluntarily came to the sheriff's department and was never under arrest or suspected of any crime and an officer knocked the plaintiff to the floor, jumped on him, crushed his nose, lacerated his nose and lips, and bruised his ribs to quiet the drunk plaintiff down); *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (finding excessive force where a 300-pound officer violently jerked a ten-year-old child out of her living room chair and dragged her into another room, where the child was not under arrest and did not pose a threat to anyone); *McDonald III v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992) (allowing an excessive force claim to go forward where the officer held his gun to the head of a nine-year-old child and threatened to pull the trigger, where the child was not a suspect, not attempting to evade the officers, nor posing a threat).

Defendants argue that Mrs. Smith cannot show that Cpl. Mashburn's push caused injury to her knee because Mrs. Smith had a preexisting knee injury.  (Defs.'

Summ. J. Br. 15.)  "[R]easonable force does not become excessive force when the force aggravates (however severely) a preexisting condition . . . unknown to the officer at the time."  *Lee*, 284 F.3d at 1200 (quotation marks and citation omitted). No one disputes that Cpl. Mashburn had no reason to know of Mrs. Smith's knee injury.  However, whether a plaintiff had a preexisting injury is not dispositive on an excessive force claim.  *De minimus* force and injury will not defeat an excessive force claim where the officer had no probable cause to effectuate an arrest on an arrestee. *See Reese v. Herbert*, 527 F.3d 1253, 1272–73 (11th Cir. 2008) (finding in the absence of probable cause, the officer was not entitled to use any force on the arrestee).  Thus, by even more compelling reasoning, an excessive force claim would not be defeated where the officer did not attempt to arrest the plaintiff and did not suspect her of any crime.

Thus, when the facts are taken in the light most favorable to Mrs. Smith, she demonstrates a Fourth Amendment violation of her right to be free from excessive force.  Having shown that Cpl. Mashburn "violated a constitutional right," *Townsend*, 601 F.3d at 1157, Mrs. Smith has satisfied the first prong of the qualified immunity defense.  The analysis now turns to the second prong of the qualified immunity defense.

ii.     **Whether Cpl. Mashburn Violated a Clearly Established
Right**

Mrs. Smith's right to be free from excessive force is clearly established.
Incorporating the words of *Payton*, "no objectively reasonable police officer could
believe that, consistent with the dictates of the Constitution, he could [push a woman
hard enough that she would almost fall into a table,] who was suspected of no crime,
who verbally objected to the search of her home in a non-belligerent manner and
made no aggressive movements . . . ."  413 F. App'x at 133.  Thus, the facts here
indicate that the force used by Cpl. Mashburn was "so far beyond the hazy border
between excessive and acceptable force [that every objectively reasonable officer]
had to know he was violating the Constitution without case law on point."  *Vinyard*,
311 F.3d at 1355 (citation and internal quotation marks omitted).

Because Cpl. Mashburn denies shoving Mrs. Smith, there is a genuine issue of
material fact that must be resolved by a jury, and qualified immunity is due to be
denied at this time.

*4.     Filing a False Report or Complaint (Count C)*

All Defendants are entitled to summary judgment on Mr. Haigler's § 1983
claim for filing a false report or complaint.  Plaintiffs cite no authority that filing a
false report or complaint is a viable claim under § 1983.   While the alleged

39

misrepresentation in the report is relevant to Mr. Haigler's claims of unlawful arrest and false imprisonment as discussed *supra* in Part V.B.2, it is not a separate claim. *See Koch v. Austin*, No. 1:03-CV-5021, 2006 WL 403818, at *5 (E.D. Cal. Feb. 16, 2006) (finding that "a complaint alleging that an officer filed a false report, by itself, fails to state a claim upon which relief can be granted); *Webb v. Abolt*, No. CV406-209, 2007 WL 39714, at *3 (S.D. Ga. Jan. 4, 2007); *Pratt v. Rowland*, 769 F. Supp. 1128, 11234 (N.D. Cal. 1991) (filing a false report will state a claim if in retaliation for exercising a constitutional right).

Section 1983 requires that the plaintiff name the constitutional deprivation. Mr. Haigler does not demonstrate which constitutional right is violated when false information is included in a police report.  If it is assumed that Mr. Haigler is claiming a Fourth Amendment violation of his right against unreasonable seizure, Mr. Haigler cannot show that the filing of the false report caused a seizure.  Cpl. Morris did not fill out this report until *after* Mr. Haigler had already been arrested and imprisoned.  The report did not lead to Mr. Haigler being incarcerated; his alleged unlawful arrest did.

Furthermore, Mr. Haigler's claim cannot be construed as a malicious prosecution claim under § 1983.  A claim for malicious prosecution requires "that the

prior proceeding end[] in favor of the present plaintiff."[21] *Delchamps, Inc. v. Bryan*, 738 So. 2d 824, 831–32 (Ala. 1999).  Plaintiffs present no evidence about the result of Mr. Haigler's state trial.[21]  Thus, all Defendants are entitled to summary judgment as a matter of law on Mr. Haigler's § 1983 claims predicated on the filing of a false report.

## C.    **Chief Murphy**

Plaintiffs contend that Chief Murphy is also liable on their § 1983 claims of excessive force, false arrest, false imprisonment and filing a false report based upon a supervisory liability theory.[22]  As stated above, all Defendants have been granted summary judgment on Mr. Haigler's claim of filing a false report.  Thus, the remaining supervisory claims against Chief Murphy relate to the Fourth Amendment

---

[21] "To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures [and] the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003) (emphasis omitted).  Under Alabama law, the following are required to make a claim of malicious prosecution: "(1) that a prior judicial proceeding was instituted by the present defendant, (2) that in the prior proceeding the present defendant acted without probable cause and with malice, (3) that the prior proceeding ended in favor of the present plaintiff, and (4) that the present plaintiff was damaged as a result of the prior proceeding." *Delchamps, Inc.*, 738 So. 2d at 831–32.

[21] Plaintiffs' counsel argued at the pretrial hearing held October 19, 2011, that Mr. Haigler was acquitted of the unlawful possession of marijuana charge.  Because no evidence of this acquittal was submitted, it cannot be considered.  *See* Fed. R. Civ. P. 56(c).

[22] On these facts, there can be no liability solely on the underlying alleged constitutional violations because there is no evidence of personal involvement by Chief Murphy, as discussed below.

violations for excessive force, false arrest, and false imprisonment. *See Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008) ("There can be no supervisory liability . . . if there was no underlying constitutional violation . . . .").

The law is well settled that a defendant cannot be held liable in an action brought pursuant to § 1983 under a theory of respondeat superior or on the basis of vicarious liability. *Gray v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006); *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990); *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). The language of § 1983 requires proof of an affirmative causal connection between the actions taken by a defendant and the alleged constitutional deprivation. *Zatler*, 802 F.2d at 401.

Although supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability, *Gray*, 458 F.3d at 1308, supervisors can be held liable for subordinates' constitutional violations on the basis of supervisory liability under § 1983. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Supervisory liability under § 1983 occurs "either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Id.* A causal connection may be

42

established when: (1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; (2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so. *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007); *Cottone*, 326 F.3d at 1360.   Deprivations that constitute widespread abuse sufficient to constitute notice to the supervising official must be "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F. 2d 667, 671 (11th Cir. 1990).

Plaintiffs have presented no evidence that Chief Murphy participated personally in any of the events surrounding the August 7, 2010 incident.   Thus, in order to survive summary judgment, Plaintiffs must have provided evidence of a causal connection.   Plaintiffs have not presented any evidence that Chief Murphy had a custom or policy that resulted in deliberate indifference.   In fact, Chief Murphy was not the Chief of Police when these incidents occurred but was the Deputy Chief of Police.   (Pls.' Am. Compl. 10–11 (Doc. # 30).)   Additionally, Plaintiffs have not presented any evidence that would support an inference that Chief Murphy, in his former position as deputy chief,  directed Cpls. Morris and Mashburn to act the way

they did or that Chief Murphy knew that Cpls. Morris and Mashburn would act unlawfully.  Plaintiffs have submitted affidavits stating that Chief Murphy told Mrs. Smith in a meeting that many of the young officers "have no real life experiences, and . . . sometimes are not prepared to deal with many of the emotions, attitudes, and behaviors they face from the public on a daily basis." (Mays Aff. ¶ 3.)  Chief Murphy went on to say that changing the officers' shirt colors and uniforms may help diffuse situations and that he is focusing on this as the new chief of police.  (Mays Aff. ¶ 3.) However, these comments came after the incident, when Chief Murphy had become Montgomery's Chief of Police.  These comments do not show that Chief Murphy knew Cpls Morris and Mashburn would act unlawfully.

Plaintiffs argue that there is a "widespread pattern of police abuse and misconduct in Montgomery, Alabama [that] has been fostered and, thus, sanctioned by [Chief Murphy]."  (Pls.' Am. Compl. 17.)  Plaintiffs point to three newspaper articles detailing misconduct by Montgomery police officers.  Assuming these articles would be admissible and are acceptable means of providing notice to Chief Murphy, which is dubious at best,[23] they are not enough to show a history of widespread abuse.

---

[23]  Newspaper articles generally are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted.  *See United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005) ("The Miami Herald articles are . . . inadmissible hearsay, as they are relevant primarily to establish the truth of their contents – the identity of the gunmen.").  Indeed, statements in newspapers often present hearsay within hearsay problems. *Id.* at 1211 n.23 ("[T]he articles are likely a reporter's account of what eyewitnesses reported; in other words, double hearsay

Two of the articles were published in October 2010, more than two months after the date of the incident at issue. Another article reports that a Montgomery police officer was caught pulling over cars and stealing possessions inside. This article would not put Chief Murphy on notice that there was a problem of excessive force within the police department.

Because Plaintiffs cannot show that Chief Murphy personally participated in or otherwise caused the constitutional deprivations to Mr. Haigler and Mrs. Smith, summary judgment is due to be granted on all claims against Chief Murphy.

## D.   **City of Montgomery**

Plaintiffs assert the same claims against the City as they do against Chief Murphy. For similar reasons granting summary judgment on all claims against Chief Murphy, summary judgment is due to be granted on all claims against the City.

### 1.   *Municipal Liability*

It is well established that a municipality cannot be held liable for a § 1983 violation based upon the theory of respondeat superior; it must have *itself* caused the constitutional violation at issue. *Skop*, 485 F.3d at 1145 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)). Thus, Mrs. Smith and Mr. Haigler can

---

forbidden by Rule 805."). And, "[t]he general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation and internal footnote omitted).

only succeed on their § 1983 claims against the City of Montgomery by showing: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The Eleventh Circuit has "emphasized that, to establish a policy or custom, 'it is generally necessary to show a persistent and wide-spread practice.'" *Turner v. Jones*, 415 F. App'x 196, 202 (11th Cir. 2011) (per curiam) (quoting *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986)).

Here, Plaintiffs have presented no evidence that the City of Montgomery itself caused Mrs. Smith's and Mrs. Haigler's constitutional deprivations due to excessive force, false arrest and false imprisonment. These claims against the City are founded on the basis of respondeat superior, which cannot be a basis for establishing liability on the city. *See Skop*, 485 F.3d at 1145. In addition, Plaintiffs have not identified any policy or custom promoted by the City that would have caused these violations. Thus, the City is due to be granted summary judgment on these claims.

### 2.   *Failure to Supervise (Count D)*

A plaintiff may prove that a failure to supervise is a city policy by demonstrating that the city's failure "evidenced a 'deliberate indifference' to the

46

rights of its inhabitants." *Gold*, 151 F.3d at 1350. Deliberate indifference requires proof that "the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1351.

As stated above, Plaintiffs have not submitted any evidence that would put the City on notice of a need to supervise the Jump Street team. Assuming, for argument only, that the newspaper articles would be admissible, the three newspaper articles alone are not enough "to show a persistent and widespread practice." There is no evidence that the City was aware that this unit had engaged in previous similar patterns of abuse.

## VI. CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. # 40) is GRANTED in part and DENIED in part as follows:

1. Summary judgment is GRANTED on (1) all claims against Mayor Strange, (2) the § 1985(2) claims against all Defendants, (3) the § 1985(3) claims against all Defendants, (4) the fraud claims under Alabama law against all Defendants, (5) Mrs. Smith's § 1983 Fourth

Amendment excessive force claim against Cpl. Morris, (6) Mr. Haigler's § 1983 false report claims against all Defendants, and (7) all claims against Chief Murphy, and (8) all claims against the City of Montgomery.

2.    Summary judgment is DENIED with respect to (1) Mrs. Smith's § 1983 Fourth Amendment excessive force claim against Cpl. Mashburn, (2) Mr. Haigler's § 1983 Fourth Amendment excessive force claims against Cpls. Mashburn and Morris for force used after his arrest, and (3) Mr. Haigler's § 1983 Fourth Amendment false arrest/false imprisonment claims against Cpls. Mashburn and Morris.

DONE this 2nd day of November, 2011.

_____ /s/ W.  Keith Watkins _____

CHIEF UNITED STATES DISTRICT JUDGE